## Lawson B. McKee *v.* J. J. and W. Amonett.

By the common law, a surety is not entitled to a subrogation to the rights of the creditor upon paying a joint judgment against him and the principal. The judgment is extinguished by the payment.

Compensation must rest on the basis of good faith; and where the party setting up the same has been guilty of bad faith in acquiring his claim, he will not be allowed the benefit of compensation.

APPEAL from the District Court of Madison, *Richardson*, J. *Bemiss*, for plaintiff. *J. J. Amonett*, for defendants. The judgment of the court was pronounced by

ROST, J. This action is brought to recover from the defendants two slaves, named *Sam* and *Asbury*, or their value. The defendants answered that they acquired title to the slaves on the 3d of August, 1846, at a sheriff's sale, made by virtue of an execution issued in the suit of the *Bank of Tennessee, for the use of W.* and *J. J. Amonett* and *J. Folkes*, v. *McKee;* being a proceeding by executory process upon a judgment obtained in Tennessee against *McKee, Folkes et als.* They also allege that they, with *Folkes*, were the owners in equal portions of that judgment; and pleaded its amount in compensation and reconvention. They cited *Folkes* in warranty by service of citation upon a *curator ad hoc* appointed to defend him. The curator filed an answer, in which he unites with the defendants in asserting the validity of their title, and also in their pleas. An unsuccessful motion was made by the plaintiffs to strike out the call in warranty. There was judgment in favor of *W.* and *J. Amonett* and *Folkes*, for the amount of the Tennessee judgment, after deducting the value of the slaves, which was estimated at $533 33. The plaintiff has appealed.

In order properly to appreciate the title which the defendants assert, under the sheriff's sale, it is necessary to review the circumstances which preceded their purchase. It appears, that on the 23d January, 1846, a suit by attachment was brought in the district court for the parish of Madison by one *Powell* against *McKee*, a non-resident, upon an alleged indebtedness. The petition was signed by *A. Pierce* and the *Messieurs Amonett* as the attorneys of *Powell*. The attachment bond given in favor of the absent defendant, as required by law, to protect him from such damages as he might sustain if the attachment should be found to have been unlawfully issued, was signed by *Pierce* and *James J. Amonett*, as sureties. Under the writ, the sheriff on the same day seized, as the property of *McKee*, three slaves, *Sam, Asbury* and *Rebecca*, and also a

McKee
v.
Amonett.

wagon and harness. On the same day, *W. S. Thompson*, purporting to act as the agent of *McKee*, the absent defendant, but who was in reality the accomplice of *Powell*, executed, with the consent of *Powell*, a forthcoming bond for the slaves and chattels, conditioned for the satisfaction of such judgment as might be rendered against *McKee*. This bond is signed by *A. Pierce* and *James J. Amonett*, as sureties; they, as we have already stated, being the attornies of record for and sureties of the attaching creditor. At the foot of this bond is a memorandum of like date, signed by *Powell*, in which he states, that though the bond is conditioned to pay the judgment rendered against *McKee*, he only requires that the property attached be forthcoming, and acknowledges that one of the slaves, *Rebecca*, and the chattels attached have been placed in his possession. On the same day, an agreement, attested by *J. J. Amonett*, was signed by *Thompson*, purporting to act as agent for *McKee*, and by *Powell*, by which it was agreed that the two slaves, *Asbury* and *Sam*, should be left with *Pierce*, until the suit should be determined, with liberty to hire them out. They subsequently, it appears, came into the possession of the *Messieurs Amonett*. On the 21st of April, 1846, *McKee* appeared in the cause, by counsel, and moved the dissolution of the attachment, upon the ground that the property attached had been secretly and fraudulently removed from his domicil in the State of Mississippi by the plaintiff *Powell*. Upon hearing, on the 21st of April, 1846, a decree was made dissolving the attachment; and in the same month *Powell* obtained an order for a suspensive appeal. *Pierce* and the *Messieurs Amonett* signed the appeal bond as his sureties. The cause was determined in this court at the February term, 1849, by an affirmance of the judgment. The court then observed, what we may now reiterate, that. the evidence showed conclusively that the plaintiff *Powell* obtained fraudulent possession of the property attached, in the State of Mississippi, and clandestinely removed it to this State without the knowledge or consent of the owner and defendant, *McKee*; and immediately levied an attachment upon it. We held, that the wrongful and fraudulent act of the plaintiff in bringing the defendant's property into this State, gave no jurisdiction to our courts, and that the district court did not err in dissolving the attachment.

Being thus foiled for the time being in the attempt to deprive *McKee* of his property through the attachment, but, at the same time, holding on to the possession of the slaves, through the instrumentality of a suspensive appeal, another device was put in motion. *William Amonett* went to Tennessee, and, on the 14th of May, 1846, obtained from the clerk of the Circuit Court of Shelby County in that State, an authenticated transcript of the record of the suit of the *Bank of Tennessee* v. *McKee, Folkes et als*. Although the visit of *Mr. Amonett* to Tennessee is not expressly proved by the testimony of witnesses who saw him there, it results conclusively from the fact admitted at the trial of the present cause, that the body of the transcript is in his handwriting. On the 20th of May, 1846, a suit was brought upon this transcript in the name of the Bank of Tennessee, which is represented in the petition as " suing for the use and benefit of *Jeptha Folkes*, of the State of Tennessee, and *J. J.* and *William Amonett*. And here, in passing, we may remark, that there is no evidence whatever offered by the defendants to show that the Bank made an assignment of its judgment, or authorized suit to be brought in its name for the use of *Messrs. Amonett* and *Folkes*, or that the *Messrs. Amonett* ever acquired an interest in the claim. The petition in that cause further stated, that *McKee* had been condemned in the Tennessee judgment, as principal debtor, and *Folkes*

as endorser; and that, as endorser, he had paid the amount of the judgment and costs, and thereby became the subrogated creditor of *McKee*. Upon this petition and transcript an *ex parte* decree was forthwith obtained, rendering the judgment executory in this State, and ordering a writ of seizure and sale to issue. On the 9th of June, 1846, a writ was issued; the slaves, *Sam* and *Asbury*, were seized, and, in the ensuing August, were sold at sheriff's sale to *J. J.* and *William Amonett*, the present defendants, for the sum of $533 32; which was settled, by direction of *Messrs. Amonett*, by crediting that amoun; upon the writ. An appointment of *curator ad hoc* to represent *McKee* was made by the judge; but it does not appear from the record that the person named accepted the appointment, or took any action to protect the absent defendant, by notifying him of the seizure or otherwise. In the ensuing fall or winter, *W. Amonett* sold the slave *Sam* to *Pugh*, for an amount not shown by the evidence; and the slave *Asbury* was sold by one of the *Messrs. Amonett*, for $375 or $400.

It is proved by a witness, examined under commission taken out by the defendants, that the Tennessee judgment was paid and satisfied by *Folkes*, the endorser of the bill of exchange drawn by *McKee, Young & Co.*, upon which that judgment was obtained against the several parties to the bill. A counsellor at law in Tennessee, who was also examined under a commission taken out by the defendants, deposes that the common law prevails in Tennessee, and that a payment there by the endorser of a bill constitutes a cause of action against the drawer for the amount paid, and a legal right of set-off to any debt or money demand upon which the common law action of debt or *indebitatus assumpsit* would lie. He also gives as his opinion, that by the law of that State, as at common law, payment of a judgment by one party extinguishes that judgment as to all parties.

The opinion expressed by the witness, that a joint judgment against the drawer and endorser of a bill of exchange is extinguished by a payment of that judgment by the endorser, is sustained, we find, by learned commentators. The rule, says Mr. Pittman, in his treatise on Principal and Surety, which entitles the surety, upon paying off the debt of his principal, to call upon the creditor for a surrender of all the securities which he has belonging to the principal for the purpose of obtaining his reimbursement, must be qualified by considering it to apply to such securities as continue to exist, and do not get back upon payment to the person of the principal debtor. So, observes that author, where the principal and surety gave to the creditor a joint and several promissory note, and the creditor brought separate actions against the principal and surety, and upon execution issued upon the judgment obtained against the surety. the surety paid the debt and costs. Upon bill filed by the representatives of the surety for the purpose of obtaining an assignment of the judgment which had been recovered by the principal debtor, it was held that the creditor having been paid his debt the judgment was satisfied, and the creditor would not have been permitted to proceed upon it at law against the principal; and it not being available at law in his hands, neither was it available in equity in the hands of the surety, and consequently the surety could not compel an assignment of it. To the same effect is the language of Mr. Story, in his treatise on Equity Jurisprudence, § 499 *et seq*. See also the opinion of Lord Elden, in *Copis v. Middleton*. Ib., in note.

How then do the defendants stand before us? They are purchasers under executory process, issued upon an *ex parte* decree obtained by themselves, upon

McKee
v.
Amonett.

a judgment which was extinct in the State where it was rendered, and by whose laws its legal effect must be determined. This executory process was enforced by themselves, the defendant and owner being absent, against property fraudulently brought, as they well knew, into the jurisdiction of the court; and which they, colluding with the parties who had been guilty of so bringing it here, had managed to withhold from its owner, after the unlawfulness of the attachment had been adjudged, by means of a suspensive appeal. It is impossible for a court of justice to sanction a title so obtained, or view those purchasers in any other light than as wrong-doers, who are bound to restore the property so obtained, or respond to the owner in its value at the time of the wrongful conversion.

The attitude in which the defendants present themselves is also a sufficient reason for disregarding the plea of compensation. As we observed in the case of *Nolan* v. *Shaw, ante p.* 40, compensation must rest on the basis of good faith. See also Civil Code, article 2207.

It is therefore decreed, that the judgment of the district court be reversed; and it is further decreed, that the plaintiff recover of the defendants, *J. J. Amonett* and of the succession of *William Amonett*, deceased, *in solido*, the sum of $1050, being the value of the slaves, *Sam* and *Asbury*, with interest thereon from the 3d day of August, 1846, until paid, and costs in both courts.